Vacated by Supreme Court, January 24, 2005

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.

ANDRE E. RIGGS,
          *Defendant-Appellee.*

No. 03-4017

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CR-01-187-JFM)

Argued: January 23, 2004

Decided: June 3, 2004

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge Shedd wrote the majority opinion, in which Judge Niemeyer joined. Judge Duncan wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Philip S. Jackson, Assistant United States Attorney, Baltimore, Maryland, for Appellant. Kelli Colleen McTaggart, Assistant Federal Public Defender, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellant. James Wyda, Federal Public Defender, Jeffrey Risberg, Assistant Federal Public Defender, Greenbelt, Maryland, for Appellee.

**OPINION**

SHEDD, Circuit Judge:

Andre Riggs pled guilty to possession of a firearm after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g). At sentencing, the district court granted Riggs a downward departure under § 5K2.13 of the United States Sentencing Guidelines based upon his diminished mental capacity. Because Riggs is not eligible for a downward departure, we vacate his sentence and remand for resentencing.

I.

In March 2001, a Baltimore City police officer stopped Riggs for driving a vehicle with expired license tags. After the vehicle was stopped, the officer observed Riggs clutching the left side of his jacket. The officer asked Riggs to show his hands, but Riggs refused and continued to clutch his jacket. The officer subsequently stepped back from the vehicle and waited for back-up officers to arrive. When the back-up officers arrived at the scene, they ordered Riggs to exit the vehicle. Riggs complied, and a pat-down frisk resulted in the discovery of a .22 revolver in Riggs's jacket.

Riggs had previously been convicted in Maryland state court on charges of drug distribution and possession of a short-barrel shotgun. Riggs was sentenced to ten years' imprisonment on the distribution counts and three years' imprisonment on the firearm count. These sentences were suspended, and Riggs completed three years of probation.

Riggs suffers from paranoid schizophrenia and, unless medicated, experiences auditory hallucinations and feelings of paranoia. At the time of his arrest for the firearm offense at issue here, Riggs had stopped taking his medication and had begun to hallucinate. In fact, he was under the impression that people were trying to "hurt" him and that he was an undercover police officer. During the approximately twenty months between his arrest and the sentencing hearing, however, Riggs's condition seems to have improved. Riggs's mother

reminds him to take his oral medication, and his physician administers intramuscular injections of antipsychotic drugs. Because the injections are absorbed into the bloodstream slowly, they keep Riggs medicated for periods of up to a month even if he fails to take his oral medication.

The district court determined that Riggs's offense level was 17 with a criminal history category of I, resulting in a sentencing range of 24 to 30 months. Riggs moved for a downward departure based upon his diminished mental capacity. The district court granted a seven-level downward departure and sentenced Riggs to three years' probation, of which 12 months was to be served under home confinement with an electronic home monitoring system. The government appeals the district court's decision to grant the downward departure.

## II.

The diminished capacity guideline, § 5K2.13, provides that a sentence below the applicable guideline range may be imposed "if the defendant committed the offense while suffering from a significantly reduced mental capacity." However, under the version of § 5K2.13 in effect at the time of Riggs's sentencing, the district court may not depart below the applicable guideline range if any one of the following conditions applies:

> (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.

U.S.S.G. § 5K2.13 (2002), *amended by* Amendment 649, effective April 30, 2003.

In granting the downward departure motion, the district court first noted in its oral ruling that there was no indication that Riggs had voluntarily used drugs. The government does not challenge this finding

on appeal. Next, the district court appeared to state the conclusion that Riggs was not going to shoot the officers, and therefore, Riggs's offense did not involve a serious threat of violence. Finally, in addressing the public protection aspect of § 5K2.13 (found in both § 5K2.13(2) and § 5K2.13(3)), the district court stated:

> I really do think that to the extent one can tell, based upon the facts as they now exist, things are under control, that you have been taking your medication, your mother is making sure, and you are [sic] treating physician is making sure you take your medication, and as long as you do that I think you are going to be lawabiding [sic].

This statement appears to mean that the success of Riggs's treatment plan, at the time of sentencing, alleviated public protection concerns.

We review the district court's decision to depart from the applicable Guidelines range *de novo*. 18 U.S.C. § 3742(e).[1] As to the district court's determination whether the offense involved a serious threat of violence under the diminished capacity guideline, we review for clear error. *See United States v. Bowe*, 257 F.3d 336, 347 (4th Cir. 2001). A finding of the district court is clearly erroneous "when although

---

[1] Prior to April 30, 2003, we reviewed a district court's decision to depart from the Guidelines for abuse of discretion. *Koon v. United States*, 518 U.S. 81, 98-100 (1996). Congress, however, amended 18 U.S.C. § 3742(e) to provide for *de novo* review of a district court's decision to depart "from the applicable guideline range based on a factor" that "is not justified by the facts of the case." *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, § 401(d)(1)-(2), 117 Stat. 650, 670. Because we are asked to determine whether the facts of this case justify a downward departure for diminished mental capacity, we conclude that the correct standard of review is *de novo*. *See United States v. May*, 359 F.3d 683, 687-88 (4th Cir. 2004)(reviewing *de novo* the district court's grant of a downward departure under § 5K2.10 for victim conduct). Although Riggs was sentenced prior to the effective date of the PROTECT Act, application of a heightened standard of review does not violate the Ex Post Facto Clause because it does not change the legal standards governing the decision. *United States v. Stockton*, 349 F.3d 755 n.4 (4th Cir. 2003).

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

A.

We first consider whether Riggs's offense involved a serious threat of violence. Under § 5K2.13(2), a district court is directed to consider "the facts and circumstances of the defendant's offense" in determining whether it involved a "serious threat of violence."[2] Here, the district court apparently determined that Riggs was not going to shoot the officers, and therefore, Riggs's offense did not involve a serious threat of violence.

We conclude, however, that the district court's factual finding in this regard was clearly erroneous because the facts and circumstances of Riggs's offense did involve a serious threat of violence. It is undisputed that Riggs was carrying a firearm at the time of the traffic stop and that he refused to comply with an officer's order to remove his

---

[2]Prior to a 1998 amendment to § 5K2.13, a circuit split existed as to whether the inquiry under § 5K2.13 was synonymous with the categorical approach used to determine a "crime of violence" under § 4B1.2, the career offender guideline. *See United States v. Weddle*, 30 F.3d 532, 537-38 (4th Cir. 1994). The categorical approach requires courts to examine only the fact of conviction and the statutory definition of the offense, *United States v. Pierce*, 278 F.3d 282, 286 (4th Cir. 2002), rather than conducting "a wideranging inquiry into the specific circumstances surrounding a conviction," *United States v. Johnson*, 246 F.3d 330, 333 (4th Cir. 2001). The 1998 amendment, however, resolved the circuit split by directing district courts to consider the "facts and circumstances of the defendant's offense," which differs markedly from the categorical approach. Thus, although we have held under the categorical approach that possession of a firearm by a convicted felon is not a "crime of violence" for purposes of § 4B1.2, *see United States v. Johnson*, 953 F.2d 110, 155 (4th Cir. 1991); *see also* USSG § 4B1.2, cmt. n.1 (stating that the term "[C]rime of violence does not include the offense of unlawful possession of a firearm by a felon"), that does not control the result here because § 5K2.13 requires a fact-specific inquiry into the circumstances of the offense.

hands from the jacket where the gun was located. Riggs's refusal to obey the officer's order, while at the same time clutching his jacket, created a highly volatile situation that could have erupted in violence. Moreover, Riggs thought that he was an undercover police officer and that people were trying to hurt him. These facts suggest, if anything, that Riggs was prepared to use the firearm, exposing the officers and the public to potential harm.[3] While the dissent maintains that we have based our determination solely on the officer's subjective perception of threatened violence, this is clearly not the case. Our conclusion is based, rather, on all of the relevant and objective "facts and circumstances" of the offense, including the fact that Riggs was carrying a firearm and the fact that he thought he was an undercover police officer—both of which were unknown to the arresting officer. Accordingly, we hold that the district court erred in determining that the facts and circumstances of Riggs's offense did not involve a serious threat of violence.

---

[3]We also reject Riggs's argument that the offense did not involve a threat of violence—much less a serious threat—because he did not make any threatening gestures or statements. While the word "threat" may mean "an expression of an intention to inflict pain, injury, evil, or punishment," *American Heritage Dictionary* 1801 (4th ed. 2000), it also means "an indication of impending danger or harm." *Id. See also Merriam-Webster's Collegiate Dictionary* 1302 (11th ed. 2003). If the Sentencing Commission intended to restrict the meaning of "threat" to the former, it could have prohibited the district court from granting a downward departure only if the defendant made a serious threat of violence. *See* USSG § 5C1.2 (providing that a district court may depart below the statutory minimum under the "safety valve" provision if, among other things, the defendant "did not use violence or credible threats of violence"). Here, a downward departure is prohibited if the facts and circumstances of the offense "involved" a serious threat of violence. This choice of language strongly suggests that the word "threat" is broader than gestures or statements, and includes activities that are "an indication of impending danger or harm." The district court apparently understood the word "threat" to be used in this sense as well — finding that there was no threat that Riggs was going to shoot the officers, rather than finding that Riggs had failed to make a threat. Because we have no trouble concluding that the facts and circumstances of Riggs's offense were an indication of impending danger or harm, they were "threats" within the meaning of § 5K2.13.

B.

Although we have determined that Riggs's offense involved a serious threat of violence, our inquiry does not end there because a downward departure is prohibited under § 5K2.13(2) only if "the facts and circumstances of the defendant's offense indicate a need to protect the public." In addressing this question, the district court determined that Riggs's treatment regimen, which consists of his doctor's administration of intramuscular injections and his mother's reminders to take his oral medication, alleviated public protection concerns. We hold, however, that despite the apparent success of Riggs's treatment plan, "the facts and circumstances" of his offense "indicate a need to protect the public," and the district court therefore erred in granting the downward departure.

Riggs's failure to take his medication is a fact and a circumstance that led to a serious threat of violence, thereby endangering the public. It remains, however, for us to decide whether, *at the time of sentencing*, that "fact" still attains such that there is a need to protect the public. We find that it clearly does. Although Riggs has been complying with his treatment program, we see no adequate assurance in the record that he will continue to do so. If Riggs were to decide that he no longer wants to receive the injections, he could refuse to visit his doctor. Likewise, Riggs could decline to take his oral medication, despite his mother's reminders. A discontinuation in Riggs's medication could easily lead to a recurrence of symptoms whereby Riggs's actions pose a serious threat of violence. We conclude, therefore, that because Riggs may discontinue his medication in the future (and has done so in the past), a need to protect the public has been established. Accordingly, Riggs's diminished capacity does not justify a downward departure under § 5K2.13(2).[4]

---

[4]The dissent suggests that this conclusion is inconsistent with our statement in *United States v. Weddle*, 30 F.3d 532 (4th Cir. 1994), that the purpose of § 5K2.13 "is to treat with lenity those individuals whose reduced mental capacity contributed to commission of a crime." *Id.* at 540 (internal quotation marks omitted). While it is true as a general proposition that § 5K2.13 provides for lenity, we are required to apply the language of the guideline, which prohibits a downward departure, *despite the defendant's significantly reduced mental capacity*, "if the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence."

### III.

Because we have determined that the downward departure was prohibited under § 5K2.13(2), we need not address whether the departure was also prohibited under § 5K2.13(3). Accordingly, we vacate Riggs's sentence and remand for resentencing in accordance with this opinion.

*VACATED AND REMANDED*

DUNCAN, Circuit Judge, dissenting:

The majority holds that, under United States Sentencing Guideline ("U.S.S.G.") § 5K2.13(2), the defendant's failure to move or respond to the police constituted a serious threat of violence. It also holds that, while acknowledging the "apparent success of Riggs's treatment plan," *ante* at 7, the possibility that the defendant *might*, at some future time, decide not to take his medications requires the defendant's incarceration to protect the public. I strongly disagree that the facts support the former conclusion, and believe that the latter misapplies our standard of review and rests primarily on speculation. Further, I agree with the district court that the defendant's criminal history does not indicate a need to protect the public that would preclude a downward departure under § 5K2.13(3). Because I find that the district court properly applied § 5K2.13 to the facts of this case, I would affirm its sentence. Accordingly, I dissent.

### I.

Section 5K2.13 permits a district court to impose a sentence below the applicable guideline range "if the defendant committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. § 5K2.13 (2002). The guideline precludes a departure if, *inter alia*, "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence;" or "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." U.S.S.G. § 5K2.13(2)-(3). The purpose of the guideline "is to treat with lenity those individuals whose reduced mental

capacity contributed to commission of a crime."[1] *United States v. Weddle*, 30 F.3d 532, 540 (4th Cir. 1994) (internal quotations omitted) (quoting *United States v. Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993)); *accord United States v. Cantu*, 12 F.3d 1506, 1516 (9th Cir. 1993). Indeed, this court and others have interpreted § 5K2.13 in this way. For example, although nothing in the language of the guideline suggests that the availability of medical treatment for a defendant's mental impairment should influence a sentencing court's decision to depart, *see United States v. Atkins*, 116 F.3d 1566, 1572 (D.C. Cir. 1997) (Henderson, J., dissenting), courts consider "any treatment the defendant is receiving or will receive while under sentence, [and] the likelihood that such treatment will prevent the defendant from committing further crimes." *Cantu*, 12 F.3d at 1516; *accord*, *Atkins* , 116 F.3d at 1569; *Weddle*, 30 F.3d at 540. Thus, we must resolve any ambiguity in the language of this guideline to achieve this purpose.

With this purpose in mind, I address the majority's application of § 5K2.13(2) to this case.

## II.

A sentencing court may not depart from the applicable guideline range if it finds that (1) the "offense involved actual violence or a serious threat of violence" and (2) "the facts and circumstances of the defendant's offense indicate a need to protect the public." U.S.S.G. § 5K2.13(2). I address each in turn.

---

[1]Departures based on a defendant's diminished capacity are encouraged because "two of the primary rationales for punishing an individual by incarceration — desert and deterrence — lose some of their relevance when applied to those with reduced mental capacity." *United States v. Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993). Those who are unable to control their conduct do not "deserve as much punishment as those who act maliciously or for gain." *United States v. Poff*, 926 F.2d 588, 595 (7th Cir. 1991) (Easterbrook, J., dissenting). Likewise, "[b]ecause legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails its sanction." *Id.*

A.

The majority concludes that Riggs's offense involved a serious threat of violence because his "refusal to obey the officer's order, while at the same time clutching his jacket, created a highly volatile situation that *could* have erupted in violence." *Ante* at 6 (emphasis added). By basing its holding on what could have happened, the majority apparently construes § 5K2.13 to preclude a departure if someone perceives a risk of violence. However, the availability of a departure under the guideline does not turn on a subjective perception.

A perceived risk of violence *might* be one fact relevant to determining whether an offense involved a serious threat of violence (I have found no case in which this is so), but it cannot be the sole determinant.[2] As this court has already noted, whether an offense involved a serious threat of violence is dependent upon what *actually* happened, not what could have happened. *See United States v. Bowe*, 257 F.3d 336, 347 (4th Cir. 2001) (holding that "a sentencing court should make a fact-specific investigation of the offense to determine whether it was non-violent"). A person may perceive a risk of harm without being threatened; but this perception reflects the mere *possibility* of violence, which does not preclude a departure for diminished capacity. To be relevant, the perception of violence must be based on the defendant's conduct. And if it is, then the perception simply reinforces evidence of the conduct itself. The conduct, however, constitutes the threat.[3]

The majority attempts to evade this fact by defining "threat" to mean more than just "gestures or statements," but rather to include "activities that are 'an indication of impending danger or harm.'" *Ante* at 6 n.3 (quoting AMERICAN HERITAGE DICTIONARY 1801 (4th ed.

---

[2]In fact, other courts have held that an offense does not involve a serious threat of violence because the defendant "did not possess any real intent to cause physical harm." *E.g.*, *United States v. Walter*, 256 F.3d 891, 895 (9th Cir. 2001). Clearly, a person witnessing the defendant's offense cannot have a perception of the defendant's actual intent.

[3]The perceived risk of violence might more appropriately relate to the seriousness of the threat, rather than to the existence of the threat.

2000)). But this definition, assuming its appropriateness, still requires that the defendant be engaged in an *activity* that indicates an impending danger. I fail to see how a defendant can be engaged in an activity that does not involve some gesture or statement. The majority, of course, does not state in what activity Riggs was engaged — if Riggs had taken action, the majority would hardly have found it necessary to attempt to incorporate more than just gestures and statements into the term "threat."[4] The majority's definition simply cannot support the burden placed on it.

Moreover, if the Sentencing Commission had intended to preclude a downward departure under § 5K2.13 because the defendant's offense involved a *risk* of violence, it could have said so. For example, in defining a "crime of violence" under § 4B1.2, the Commission included offenses that "involve conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a). A risk is a "possibility of suffering harm or loss." WEBSTER'S II NEW RIVERSIDE DICTIONARY 602 (1984). The majority imposes the meaning of this phrase onto "serious threat of violence" in § 5K2.13, despite the fact that the Commission decided against using this language.

This difference in terminology is particularly relevant in light of the fact that the Commission amended § 5K2.13 specifically to draw a distinction between these two guideline sections.[5] The amendment's

---

[4]If the majority construes "threat" to include the activities of someone other than the defendant, those activities can hardly be described as part of the *defendant's* offense.

[5]Prior to 1998, § 5K2.13 permitted a departure if, *inter alia*, the defendant's offense was "non-violent." *See* U.S.S.G. § 5K2.13 (1997). The courts of appeals disagreed as to the meaning of this term. Five circuits held the term to be the contrapositive of the term "crime of violence" as defined in § 4B1.2. *See United States v. Mayotte*, 76 F.3d 887, 889 (8th Cir. 1996); *United States v. Poff*, 926 F.2d 588, 591-93 (7th Cir. 1991) (en banc); *United States v. Rosen*, 896 F.2d 789, 791 (3d Cir. 1990); *United States v. Borrayo*, 898 F.2d 91, 94 (9th Cir. 1989); *United States v. Maddalena*, 893 F.2d 815, 819 (6th Cir. 1989). Thus, if the offense "(1) ha[d] as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) . . . otherwise involve[d] conduct that presents a serious potential risk of physical injury

purpose was to confirm that a finding that an offense is a crime of violence does not preclude a diminished capacity departure. *United States v. Askari*, 159 F.3d 774, 779 (3d Cir. 1998) (en banc) (discussing 1998 amendment). Narrowing the reach of § 5K2.13(2) in this manner "seems sensible when it is realized that 'section 4B1.2 can be read as depriving career offenders of the benefit of the doubt, and assuming the worst,'" whereas § 5K2.13's purpose is to treat mentally impaired defendants with lenity.[6] *Weddle*, 30 F.3d at 539-40 (quoting *Chatman*, 986 F.2d at 1451). The important point is that the Commission knew how to say that a risk of violence should preclude a § 5K2.13 departure if that is what it intended. Plainly, it did not.

Even assuming that the majority's interpretation of § 5K2.13(2) was supportable, its application of this section to the facts of this case is not. There was nothing "volatile" about Riggs's arrest. Riggs neither moved nor spoke during the police officer's initial encounter with him. Riggs was already holding his jacket when the officer first approached him, diminishing any inference that Riggs intended to

---

to another," U.S.S.G. § 4B1.2(a), then the offense was not "non-violent" and a diminished capacity departure was precluded. This court and the D.C. Circuit held that whether an offense is "non-violent" under § 5K2.13 is not controlled by whether it is a "crime of violence" — an offense could be both a crime of violence and a non-violent offense. *Weddle*, 30 F.3d at 540; *Chatman*, 986 F.2d at 1450. In 1998, the Commission amended § 5K2.13 to resolve this conflict. *See* U.S.S.G. app. C, amend. 584 (1998).

[6]The majority apparently views lenity as a consequence of the application of § 5K2.13, rather than as the guideline's purpose. Yet in *Weddle*, we relied on this purpose to interpret the term "non-violent" — the predecessor of the phrase "actual violence or a serious threat of violence." To interpret a section of § 5K2.13 without regard to the guideline's overall purpose is not only inconsistent with our decision in *Weddle*, it is contrary to our rules of statutory construction. *See United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 720 (1975) ("[W]e must interpret the [statute] in a manner most conducive to the effectuation of its goals."); *United States v. Davis*, 53 F.3d 638, 642 (4th Cir. 1995) ("[I]n statutory interpretation, nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention . . . .") (internal quotations omitted).

communicate a threat by clutching his jacket. After additional officers arrived and the police officer repeated his order to step out of the car, Riggs complied without incident. The record does not suggest that Riggs was anything but submissive after exiting his vehicle.

In addition, even if the fact that Riggs was clutching his jacket was an indication of potential danger, I fail to see how any such danger was "impending." An impending danger is a danger that is "about to happen." Webster's II New Riverside Dictionary 349 (1984). Riggs was clutching his jacket, not his firearm. As the majority notes, Riggs was afraid that "people were trying to hurt him." *Ante* at 6. Far from suggesting, "if anything, that Riggs was prepared to use the firearm," *id.*, the circumstances of Riggs's offense suggest that he was paralyzed from fear and that, consistent with the district court's findings, he "did not possess any real intent to cause physical harm." *United States v. Walter*, 256 F.3d 891, 895 (9th Cir. 2001) (reversing district court finding that defendant's written threats constituted "serious threat of violence" because defendant lacked intent to follow through with threats).

Consequently, I believe that the facts and circumstances of the instant offense plainly demonstrate that Riggs's possession conviction did not involve a serious threat of violence. I next consider the majority's conclusion that the instant offense indicates a need to incarcerate Riggs to protect the public.

### B.

The majority holds that the district court committed clear error in finding that the facts and circumstances of Riggs's offense do not indicate a need to protect the public. It reaches this conclusion "because Riggs *may* discontinue his medication in the future (and has done so in the past)." *Ante* at 7 (emphasis added). This holding transgresses the clear error standard of review.

The facts before the district court were these: Riggs was on presentence release for almost two years and had taken his medication throughout. His mother stated that she reminded Riggs daily to take his medication. Riggs emphasized to the court that he wanted to continue taking his medication, an intent that his consulting clinical psy-

chologist believed. Moreover, after Riggs's arrest, his treating physician started Riggs on an injected medication in addition to the oral medication he had previously been prescribed. These injections remained in Riggs's blood stream for one month, thus assuring that Riggs would be at all times medicated, even if he forgot or refused to take his pills. The district court credited each of these facts and held that Riggs's mental condition was "under control, that you have been taking your medication, your mother is making sure, and [your] treating physician is making sure you take your medication." J.A. at 27.

The parties agree that the cause of Riggs's instant offense was his failure to take his medication for two or three days prior to the date of his arrest. This is the only factual basis for the majority's conclusion that Riggs *might* cease taking his medication, and it relies on this fact only parenthetically. However, at the time, he was only taking oral medication. The additional injections were added to his medical regimen after the instant offense, presumably to prevent another relapse. Thus, the relevance of Riggs's prior failure to take his oral medication is considerably diminished. Aside from this fact, the majority's conclusion is pure speculation. Although the majority sees "no adequate assurance in the record" that Riggs would continue his treatment, it is difficult to imagine what more it would require. The record both amply supports the district court's holding and makes doubtful that of the majority.

But even if there were a basis in the record for the majority's holding, the district court's factual determination would still be a permissible interpretation of the record. Although the Supreme Court has indicated that a factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," the Court stressed that such a standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotations omitted). The clear error standard is not concerned with the certainty of an appellate court regarding its own view of the facts. *Id.* at 573-74. "Where there are two permissible views of the evidence, the factfinder's choice between them *cannot be clearly erroneous*." *Id.* at 574 (emphasis

added). In my opinion, the majority reaches its holding through an improper application of this standard.

### III.

Because the district court's downward departure was appropriate under § 5K2.13(2), I also address whether Riggs's "criminal history indicates a need to incarcerate [him] to protect the public." U.S.S.G. § 5K2.13(3). I agree with the district court that it does not.

Riggs was convicted in 1997 of possession with intent to distribute a controlled substance and possession of a short-barreled shotgun. At the time of his arrest, Riggs was not carrying the shotgun; it was recovered in a subsequent search of his home. According to Riggs's psychiatrist, Riggs's mental condition began to assert itself approximately two years prior to this first arrest. Riggs did not receive any psychiatric treatment until *after* his arrest.

When considered together with the facts of the instant offense, the district court plausibly concluded that Riggs would not engage in unlawful activity while medicated. The flaw in his previous treatment program — exclusive reliance on oral medication — had been corrected. Moreover, Riggs expressed commitment to his psychiatric treatment, and his mother stated that she will supervise her son's medication. Thus, for substantially the same reasons that the facts and circumstances of the instant offense do not indicate a need to incarcerate Riggs to protect the public, the district court did not err in finding that Riggs's criminal history does not indicate that he poses a threat to the public. *See, e.g.*, *United States v. Brown*, No. 96 CR 451, 1997 WL 786643, at *6-7 (N.D. Ill. 1997) (finding defendant's fourteen prior arrests and five convictions did not indicate need for incarceration where defendant was receiving proper treatment at sentencing and "committed these acts when he was not properly treating his depression"); *United States v. Speight*, 726 F. Supp. 861 (D.D.C. 1989) (finding defendant's three narcotic convictions and firearm possession conviction did not indicate need for incarceration because defendant was receiving appropriate treatment for his illness at time of sentencing).

IV.

Because I believe the majority improperly interprets § 5K2.13, and because the record amply supports the district court's factual findings, I would affirm the district court's decision to depart from the applicable guideline range. Accordingly, I dissent.